**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

-----------------------------------------------------------X
                                           :

**BENNY HOLLAND, JR., DAVID F.**        :
**ADAM, AND MANAGEMENT-ILA**       :
**MANAGED HEALTH CARE TRUST**     :
**FUND,**                                  :
              **Plaintiffs**            :
                                        :
            **v.**                     :      **Civil Action No. 4:19-cv-00022-WTM-CLR**
                                        :
**GARY SCOTT,**                      :
                                        :
            **Defendant**           :
                                        :
-----------------------------------------------------------X

### _PLAINTIFF'S BRIEF IN SUPPORT OF REQUEST FOR_<br>_AWARD OF APPROPRIATE DAMAGES_

In its November 14, 2019 _Order,_ the Court granted a _Default Judgment_ finding that Plaintiff's claims for fraud and negligent misrepresentation have been substantiated based on the _Complaint_ and supporting documentation. As pointed out by the Court, when determining an award for damages after a _Default Judgment_, the Court "has an obligation to assure that there is a legitimate basis for any damage award it enters…." _Anheuser Bush, Inc. v. Philpot_, 317 F. 3d. 1264, 1266 (11th Cir. 2003). The Court found several deficiencies with the relief requested by the Plaintiffs. These deficiencies will be addressed in the order stated by the Court.

### THE COURT CANNOT DETERMINE HOW<br>THE REQUESTED DAMAGES WERE CALCULATED

The following is a detailed description of the process followed to calculate payments that were made as a result of Defendant's fraud and negligent misrepresentation. The final calculation will show the net amount of said damages owed by Defendant Scott after giving credit for any refunds returned to MILA from providers based on requests for the same, made by MILA's Claims

Administrator.[1] Any previously calculated medical damage amount should be disregarded, because the damages requested herein are calculated from **Exhibit "D"**, MILA's final *Client Claim Status Report*.

## I.    The Controlling *Plan* Article and *Summary Plan Description* provisions

Linda Scott, as Defendant's Spouse − until they were divorced − was covered by MILA under the *MILA Premier Benefits Plan* ("*Premier Plan*"). The MILA National Health Fund which administers the *Premier Plan* is self-insured through employer contributions as set out in the *Collective Bargaining Agreement* ("*Master Contract*[2]"). (**Attachment "1"** *Supplemental Affidavit of LaVerne Thompson* ¶ 3 (**Exhibit "A"** *Premier Plan* ("*Plan*") Art. 1 §1.16 p. 8, §1.17 p. 9); (**Exhibit "B"** *Summary Plan Description* ("*SPD*"), "*Overview of MILA National Health Plan*" p. 2).

To be eligible for coverage under the *Premier Plan*, Defendant Scott worked at least 1300 or more credited hours in the Contract Year ending in the prior calendar year. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 4 (**Exhibit "A"** (*Plan*) Art. 2 § 2.01.02(b) p. 22); (**Exhibit "B"** *SPD,* "*Who is Eligible*" p. 68); (See **Attachment "2"** *Affidavit of Terry Ambrose* ¶ 4 (see **Exhibit "I"** "*Summary of Hours Worked*")).

---

[1] There are no further efforts able to be made to collect reimbursements from the remaining providers as is also reflected on **Exhibit "D"** in column D "Account Status Desc" insofar as the provider has refused to refund/respond, mail was returned, or the *Claim* has been classified as No refund – inactive.  Any further refunds can only be collected from the Participant. (See *Affidavit of LaVerne Thompson*, ¶ 13).

[2] *Master Contract* is defined in the *Plan* as "the *USMX-ILA Master Contract* which establishes the terms and conditions for longshore employees represented by the International Longshoremen's Association, AFL-CIO who are working for members of the United States Maritime Alliance, Ltd. at ports on the Atlantic and Gulf Coasts of the United States." (See *Affidavit of LaVerne Thompson* ¶ 3 **Exhibit "A"** (*Plan*) Article 1 §1.29 p. 12, *See Also* §1.16 p. 8, §1.41& §1.42 p. 16); (**Exhibit "B"** (*SPD*) "*Overview of MILA National Health Plan*" p. 2, "*Who is Eligible*" p. 68).

Benny Holland, Jr., David F. Adam, and
Management-ILA Managed Health Care Trust Fund v. Gary Scott
4:19-cv-00022-WTM-CLR
*Plaintiff's Brief in Support of Request for Award of Appropriate Damages*

An index and excerpts of the relevant *Plan* Article provisions are attached to the *Supplemental Affidavit of LaVerne Thompson* as **Exhibit "A"** (*Plan*).

- Article 1 Defines terms relevant to the *Plan*.
- Article 2 covers the Eligibility of Members for coverage under the *Plan*.
- Article 3 describes the covered medical benefits for the MILA *Premier Plan*.
- Article 5 describes the covered Prescription Drug Benefits.
- Article 15 describes the covered Dental Benefits,
- Article 16 describes the covered Vision Benefits.

Applicable benefits paid on behalf of Linda Scott were determined based on the afore-mentioned Articles. The contents of the *Plan* are summarized for distribution to each Participant in a *Summary Plan Description*, which has been attached and incorporated by reference into the *Supplemental Affidavit of LaVerne Thompson*, as **Exhibit "B"** (*SPD*).


## II.   The Claims Administrators

MILA Trustees have retained a Claims Administrator defined in the *Plan* as the Claims Manager responsible for "utilization management, for claims processing and claim appeals and for the maintenance of claim payment histories on covered individuals." (See *Supplemental Affidavit of LaVerne Thompson* ¶ 5 (**Exhibit "A"** (*Plan*) Art. 1 §§1.04-05, p. 3 §1.38 p. 14, and §1.56 p. 20)). The Claims Administrator is also "responsible for the administration of claims payments and … appeals with respect to medical benefits, mental health and chemical dependency benefits, prescription drug benefits, dental benefits and vision benefits." (See *Supplemental Affidavit of LaVerne Thompson*, **Exhibit "A"** (*Plan*) at *Id*.). Claims Administrators under the *Plan* are listed

in the *Summary Plan Description*.[3] (See *Supplemental Affidavit of LaVerne Thompson* ¶ 5 (**Exhibit "B"** (*SPD*) "*Overview*" p. 2, "*Administration*" p. 102 & "Glossary" p. 106).

### III.    The Network Contracted Providers

The *Plan* defines "In-Network" as "services rendered by a provider which has a contract or formal arrangement with the Claims Manager and which establishes specific charges and procedures for medical, mental health and chemical dependency dental or vision services." (See *Supplemental Affidavit of LaVerne Thompson* ¶ 6 (**Exhibit "A"** (*Plan*) Art. 1 §1.26 p. 11-12); (**Exhibit "B"** (*SPD*) "*Overview*" p. 2, "*MILA Premier Plan*" p. 6)). The *Plan* defines "Out-of-Network" as "services rendered by a provider which either does not have such a contract or arrangement or is operating outside such contract or arrangement in the delivery of the service or supply." *Id*.

The "Contract Rate" is defined as "the maximum allowable charge that will be recognized in reimbursing a Claims Manager's Network provider and, where specifically provided, other providers that do not have a current contract with the Claims Manager." (See *Supplemental Affidavit of LaVerne Thompson* ¶ 7 (**Exhibit "A"** (*Plan*) Art. 1 § 1.10, p. 4); (**Exhibit "B"** (*SPD*) "*What is Covered*" p. 26-27)). The *Plan* also states, "[t]he Contract Rate will be used instead of the Reasonable and Customary Charge when the Plan's contract with the Claims Manager provides for this payment basis." *Id*.

---

[3] "CIGNA manages medical networks and claims, Aetna manages dental networks and claims, EyeMed manages vision networks and First American Administrators (FAA), a wholly owned subsidiary of EyeMed Vision Care, manages claims, CIGNA Behavioral Health (CBH) manages behavioral health networks and claims and CVS Caremark manages prescription drug networks and claims." *SPD*, p. 2

### IV.      Processing Claims

When a Claims Administrator receives a *claim* for a billed amount from a provider, the Claims Administrator will pay the amount allowable for that service depending on the existence of a contract or agreement between the provider and the Claims Administrator. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 9). The Claims Administrator will then print an *Explanation of Benefits* ("*EOB*") and send it to the Participant/Subscriber. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 10). The *Explanation of Benefits* shows the identifying information of the covered Participant/Patient (Subscriber Name), the Patient's name, claim number, date of service, the type of service (e.g. supplies, surgery, etc., provider, and payment information, including: 1) the amount charged for the service; 2) the amount discounted; 3) the amount paid; and 4) any balance remaining on the account. (See *Affidavit of LaVerne Thompson* ¶ 10-11 (**Exhibit "C"** (*EOB*) (which was also previously attached to Plaintiff's pleading Document Number 14-1, filed October 8, 2019, as "**Attachment III**" to "**Exhibit 1**", p. 22-82)).

### V.      Damages

#### a)   Medical Benefits Damages

The *Premier Plan* Medical Benefits are set out in Article 3 of the *Plan* and are summarized in the *Summary Plan Description,* both of which are incorporated by reference and attached to the *Affidavit of LaVerne Thompson* as **Exhibit "A"** (*Plan*) & **Exhibit "B"** (*SPD*). The *Plan* provides for Premier Benefits coverage, under which Defendant was a Participant. (See *Supplemental Affidavit of LaVerne Thompson* ¶¶ 4, (**Exhibit "A"** (*Plan*) Art. 3 §3.01 –3.01.03 p.  51-54); (**Exhibit "B"** (*SPD*) "*MILA Premier Plan*" p. 6-9)). The Claims Administrators received medical *claims* for billed amounts on behalf of Linda Scott for treatment and all matters related thereto. Said

*claims* cover the dates of September 12, 2014 through May 5, 2017. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 12 (see **Exhibit "D"** "*Client Claim Status Report*"). In the normal course of business, the Claims Administrator paid the Contract Rate in accordance with any agreements and the terms of the *Plan*. (See *Supplemental Affidavit of LaVerne Thompson*, ¶¶ 7, 9 (**Exhibit "A"** (*Plan*) Art. 1 §1.10. p. 4); (**Exhibit "B"** (*SPD*) "*What is Covered*" p. 26-27)).

### CLIENT CLAIM STATUS REPORT

The *Client Claim Status Report* is generated by the Claims Administrator. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 12). The *Client Claim Status Report* includes claim numbers (col. E), dates of service (col. H), Provider Firm Name (col. K), Provider Tax I.D. number (col. L), Insured name (Gary Scott) (col. N-O), Insured Group Emp ID (MILA) (col. Q), Patient's name (Linda Scott) (col. R-S), Total Due on Claim (Amount paid by MILA) (col. U), and Amounts Recovered (col. V), if any, (Recovered from Providers) for all relevant times of September 12, 2014, the first payment for services after Scott's divorce on August 22, 2014, through and including May 5, 2017, the date of Linda Scott's death. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 12 (see **Exhibit "D"** "*Client Claim Status Report*")).

In addition to paying *claims* based on the benefits as allowed to eligible Participants and their Dependents, the Claims Administrators may, at times, request refunds from providers when it is discovered that *claims* were paid for services that were provided to an ineligible Participant or Dependent. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 13). Other examples of requests for refunds may occur when there has been a double-payment for a service. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 13). Such efforts depend on the relationship between MILA's Claims Administrators and the provider. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 13). These efforts are generally more successful when refunds are requested from providers who have agreements to provide services in a substantial volume for MILA. (See *Supplemental Affidavit of*

*LaVerne Thompson* ¶ 13). In some cases refunds are actual cash refunds and in others they may be set-offs against future charges. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 13). According to the provider agreements for each provider, there may be time limits on how long after a service is provided that a refund can be considered. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 13). In many provider agreements there is no provision for a refund. In many more instances providers refuse to make a refund. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 13). *Claims* were paid to providers according to the terms of the *Plan*. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 9).

The *Client Claim Status Report* shows that some of the benefit payments made for services for Linda Scott were reimbursed (e.g., where **Amount Recovered** [column "V"] intersects with [Row/Line: 109], a $19,944.43 amount is shown) by "In-Network" providers under contract with the Claims Administrators. (See *Supplemental Affidavit of LaVerne Thompson*, ¶ 13 (**Exhibit "D"**). (*See Also* **Exhibit "C"** *EOBs* for the purpose of notating the same information as is highlighted on lines 44-47, 89-93, and 97-101 in **Exhibit "D"**)). Not all the paid-out sums were refunded (where **Amount Recovered** [column "V"] intersects with [Rows/Lines: 6-108], a $0.00 amount is shown). Furthermore, there were two (2) instances where only a partial refund was received, to-wit: line 190 indicates a charge of $104.00, refunded $78.00 for a balance due of $26.00 (indicated in column "Z"); and line 207 indicates a charge of $54.98, refunded $41.24 for a balance due of $13.74 (indicated in column "Z"). (See *Supplemental Affidavit of LaVerne Thompson* ¶ 12, (**Exhibit "D"**).

The fraud and negligent misrepresentation of the Defendant resulted in damages to MILA in the amount paid by MILA (Total Due on Claim column [col. U line 222]) of $148,870.54 minus the amount refunded by the providers (Amount Recovered [col. V line 222]) of $94,414.39. The amount still outstanding as shown in column Z on **Exhibit "D"** is: $54,416.41 [lines 6-108 added]

+ $26.00 [line 190] + $13.74 [line 207] (See *Supplemental Affidavit of LaVerne Thompson* ¶12 **Exhibit "D"**).

**Therefore, the damage suffered by MILA for the payment of medical benefits is:**

**Damages**: $148,870.54 - $94,414.39 = **$54,456.15**. *Id*.

### b)  Prescription Benefits Damages

The Prescription Benefits are set out in Article 5 and summarized in the *Summary Plan Description* incorporated by reference and attached to the *Supplemental Affidavit of LaVerne* as **Exhibit "A"** (*Plan*) & **Exhibit "B"** (*SPD*).  (See *Supplemental Affidavit of LaVerne Thompson* ¶¶ 14-16 (**Exhibit "A"** (*Plan*) Art. 5); (**Exhibit "B"** (*SPD*) "*MILA Premier Plan*" p. 6-9)). The *Plan* provides that "[it] will pay the balance of the total cost of the prescription for Prescription Drugs dispensed by a participating retail pharmacy after the covered individual has paid the applicable deductible and/or Co-Pay as long as the covered individual presents his/her card at the time that the drug is dispensed." (See *Supplemental Affidavit of LaVerne Thompson* ¶ 14 (**Exhibit "A"** (*Plan*) Art. 5 § 5.02.01.); (**Exhibit "B"** (*SPD*) "*MILA Premier Plan*" p. 6-9)).

*STATEMENT OF PRESCRIPTION HISTORY*

The Claims Administrator provided a 7-page *Statement of Prescription History* detailing prescription *claims* paid on behalf of Linda Scott for the time period covering August 23, 2014 through May 2, 2017. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 15-16, **Exhibit "E"** "*Statement of Prescription History*"). The *Statement* shows Linda Scott's identifying information, including her: name, member ID, address, and date of birth. *Id*. The *Statement of Prescription History* also provides the pharmacy name, the "fill" date, the prescription (Rx) number, a national drug code ("NDC"), drug type and quantity, as well as the Total Gross Cost of $116,053.73 for

her prescriptions,  the Total Member Cost of $1,339.06 paid by Scott, and the Total Net Cost of

$114,714.67 paid by MILA. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 16 & **Exhibit**

**"E"**). The Claims Administrator processed the *claims* received in the gross amount, less any Co-

pay or Deductible amounts due by the Participant/Patient in accordance with the *Plan* in order to

determine the Total Net Cost paid on behalf of Linda Scott in the amount of $114,714.67. (See

*Supplemental Affidavit of LaVerne Thompson* ¶ 14-16 (**Exhibit "A"** (*Plan*) Art. 5 **Exhibit "E"**

"*Statement of Prescription History*"); (**Exhibit "B"** (*SPD*) "*MILA Premier Plan*" p. 6-9).

> **Therefore, the damage suffered by MILA for the payment of prescriptions is:**
>
> **Damages** = $116,053.73 - $1339.06 = **$114,714.67.**

> c) <u>**Dental Damages**</u>

The Dental Benefits are set out in Article 15 of the *Plan* and summarized in the *Summary*

*Plan Description,* incorporated by reference and attached to the *Supplemental Affidavit of Laverne*

*Thompson* as **Exhibit "A"** (*Plan*) & **Exhibit "B"** (*SPD*)**.** (See *Supplemental Affidavit of LaVerne*

*Thompson* ¶ 17-19 (**Exhibit "A"** (*Plan*) Art. 15 §§15.01 - §15.01.02 p. 140); (**Exhibit "B"** (*SPD*)

"*MILA Dental Plan"* p. 20-21)).

*STATEMENT OF DENTAL CLAIMS*

A *Statement of Dental Claims* has been produced showing the Dental Benefits received by

Linda Scott during all relevant times after Defendant's divorce and before Linda Scott's death.

(See *Supplemental Affidavit of LaVerne Thompson* ¶ 19, **Exhibit "F"** "*Statement of Dental*

*Claims*"). The *Statement of Dental Claims* shows the Dates of Service, Claim I.D., Provider Name,

ADA Code/Service, Submitted Fee, Contracted Fee, Aetna's Paid Amount, Paid To, Member's

Responsibility, and Notes. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 19, **Exhibit "F"**).

The total of the Aetna's paid amount column is the amount that was provided by MILA. **The sum**

of the paid amount column is $2,254.85. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 19, **Exhibit "F"**).

**Therefore, the damage suffered by MILA for the payment of dental *claims* is:**

**Damages: $2,254.85.**

d) **Vision Benefits Damages**

The Vision Benefits are set out in Article 16 and summarized in the *Summary Plan Description*, incorporated by reference and attached to the *Supplemental Affidavit of Laverne Thompson* as **Exhibit "A"** (*Plan*) & **Exhibit "B"** (*SPD*). (See *Supplemental Affidavit of LaVerne Thompson* ¶¶ 20 - 22 (**Exhibit "A"** (*Plan*) Art. 16 §16.01 - §16.01.02 p. 162-163); (**Exhibit "B"** (*SPD*) "*MILA Vision Plan*" p. 22-23)).

The only Vision Benefits paid during relevant times are reflected in an *Explanation of Benefits* (*EOB*) for services dated on December 20, 2014. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 22, **Exhibit "G"** "*EOB*"). The *EOB* shows submitted charges of $464.00 for said services. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 22). In compliance with the *Plan* and *SPD* cited above, MILA paid $180.00 as shown on the *EOB* by adding the amounts in the "Plan Paid" column. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 22). The process as applied to Vision Benefits is similar as to other *claims*. (See generally, *Supplemental Affidavit of LaVerne Thompson*).

**Therefore, the damage suffered by MILA for the payment of vision *claims* is:**

**Damages: $180.00**

## ARGUMENT

The Northern District of Georgia looks for "a rational basis for awarding [damages], or a reasonable methodology for calculating actual damages." *Internetshopsinc.com v. Six C*

*Consulting, Inc.*, 2011 U.S. Dist. LEXIS 31222, *9 (N.D. Ga. Mar. 24, 2011)[4]. After the Court

enters a Default Judgment under Rule 55(b)(1) - (2) of the Federal Rules of Civil

Procedure, "[w]here the amount of damages sought is a sum certain, or where an adequate record

has been made via affidavits and documentary evidence to show statutory damages, no evidentiary

hearing is required." *Capitol Records v. Carmichael*, 508 F. Supp. 2d 1079, 1085 (S.D. Ala. 2007)

(citations omitted) ("judicial determination of damages unnecessary where claim is for sum certain

or sum which can by computation be made certain"); *See also, Taylor v. Wachovia Mort. Corp.*,

2009 U.S. Dist. LEXIS 118322 (N.D. Ga. Jan. 2, 2009). Rule 55(b)(2) "speaks of evidentiary

hearings in "a permissive tone" *Frazier v. Absolute Collection Serv.*, 767 F. Supp. 2d 1354, 1365

(N.D. Ga. Dec. 28, 2010).

The Northern District of Georgia upholds that it is unnecessary to hold a hearing on

damages when all the evidence is already in the record and supported by affidavits. *Frazier v.*

*Absolute Collection Serv.*, 767 F. Supp. 2d 1354, 1365 (N.D. Ga. Dec. 28, 2010). The *Frazier* court

stated the "[u]se of affidavits in granting default judgments does not violate …due process" *Id.*

(quoting *Super Stop No. 701, Inc.*, 2009 U.S. Dist. LEXIS 117495 n. 4 (S.D. Fla. Dec. 17, 2009)

(in a default judgment procedure, unchallenged affidavits are routinely used to establish liability

and damages). *Frazier* cited other district courts in the Eleventh Circuit where a hearing was

unnecessary because the moving party provided supporting affidavits as to the issue of damages.

*Id*. at 1365; *See PNCEF, LLC v. Hendricks Bldg. Supply LLC*, 740 F. Supp. 2d 1287, 1292 n.9,

(S.D. Ala. 2010) (citing cases); *Taylor v. Wachovia Mortg. Corp.*, 2009 U.S. Dist. LEXIS 118322,

---

[4] *Internetshopinc.com* found an affidavit was not supported by underlying business records, but instead was supported only by a single spreadsheet created from the CEO's "personal knowledge." *Id*. In comparison, we have shown the *Supplemental Affidavit of LaVerne Thompson* to be supported by the actual business records used by the Claims Administrators in the regular course of their business.

(N.D. Ga. Jan. 30, 2009) (Vineyard, M.J., adopted by Thrash, J.); and *Capitol Records v. Carmichael*, 508 F. Supp. 2d 1079, 1085 (S.D. Ala. 2007)).

Georgia's Northern District again entered a Default Judgment on a counter-claim without a hearing because Defendant Wachovia, as supported by affidavits, requested $1,507,500.00 for the unpaid principal on plaintiff's loan, together with accrued and unpaid interest and late charges[5]. *Taylor* v. *Wachovia Mortg. Corp.*, 2009 U.S. Dist. LEXIS 118322, *35-36 (N.D. Ga. Jan. 2, 2009). "Thus, it is clear that Wachovia is requesting a "sum certain or . . . a sum that can be made certain by computation," and a hearing on damages is not necessary." *Id.* at *36 (citing *Capitol Records v. Carmichael*, 508 F. Supp. 2d 1079, 1085 (S.D. Ala. 2007); and *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1335, 1364 n.27 (11th Cir. 1997)).

Likewise, the Eleventh Circuit holds that a district court may consider an affidavit made upon personal knowledge, that describes the business records and attaches them thereto. *Stanley v. Kan. Counselors of Kan.* City, 639 Fed. Appx. 589 (11th Cir. 2016); Fed. R. Evid. 803(6). The testifying witness does not need firsthand knowledge of the contents of the records, their authors, or even their preparation. *United States v. Bueno-Sierra*, 99 F.3d 375, 378-79 (11th Cir. 1996). If a *qualified witness* presents circumstantial evidence to establish the trustworthiness of the underlying documents, there is no need to present testimony from the person who actually prepared the documents, kept them, or even who supervised the preparation. *Curtis v. Perkins*, 781 F.3d 1262, 1268-69 (11th Cir. 2015) (holding the underlying documents were routinely made as part of a regularly conducted activity, near the time of that activity, by someone with personal knowledge of their contents." *Id.* at 1267-1268. *See* Fed. R. Evid. 803(6)(A)—(C).

---

[5] Wachovia provided the per diem rate of accrual, the post-judgment interest rate allowed by law, and was awarded attorney's fees. *Taylor,* at *36.

In order to recover damages, you must prove them by use of calculations that can adequately explain how the damages were determined. *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415-16, 1992 U.S. App. LEXIS 16698, *19 (7th Cir. 1992). Plaintiff has shown a reasonable methodology for calculating the actual damages incurred by Plaintiff, as required by Georgia district courts. The requested sum requires no estimation, or apportioning on the part of the Court, but is instead a sum-certain figure established by the amount paid for benefits that Linda Scott was not eligible to receive and that MILA was unable to recover.

## Calculation of Damages Explained in the *Supplemental Affidavit of LaVerne Thompson*, Supported by the Actual Business Records Created in the Normal Course of Business

LaVerne Thompson is the Executive Director of the Managed- ILA Health Care Trust Fund which funds the MILA health and welfare plans. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 1, 3). As the Director, LaVerne Thompson has personal knowledge of terms in the *Plan*, the function of Claims Administrators, and the procedure followed in the normal course of their businesses. (See generally *Supplemental Affidavit of LaVerne Thompson*). As stated above, and in greater-detail in the *Supplemental Affidavit of LaVerne Thompson*, a Claims Administrator will receive a *claim* from a service-provider, determine whether the service-provider is "In" or "Out-of-Network", under the terms of the *Plan* before proceeding to process the *claim*. (See *Supplemental Affidavit of LaVerne Thompson* (**Exhibit "A"** (*Plan*) Art. 1 §1.26 p. 11, §1.35 p. 13 & Art. 3 §§3.01 –3.01.03  p. 51-54); (**Exhibit "B"** (*SPD*) "*Overview*" p. 2, "*MILA  Premier  Plan*" p. 6, "*In-Network  Services*" p. 7,  "*Prescription  Drug  Benefits*" p. 8-9, "*MILA Dental Plan*" p. 20-21, "*MILA Vision Plan*" p. 22-23, "*Using  an  In-Network  Retail Pharmacy*" p. 39)).

After processing the *Claim* and paying the appropriate benefits according to the terms of the *Plan*, the Claims Administrator will generate and send a multi-paged *Explanation of Benefits* (*EOB*)s to the *Plan* Participant to summarize the *claims* processed on his/her behalf. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 10). A sample group consisting of fourteen (14) *EOB*s is attached to the *Supplemental Affidavit of LaVerne Thompson* as **Exhibit "C"**.

The *Client Claim Status Report* is generated by the Claims Administrator as a summary of a particular *Plan* Participant's/Patient's medical benefit *claim* history. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 12). Efforts have been made to obtain refunds from providers who received payments made for medical services performed for Linda Scott. Attached to the *Supplemental Affidavit of LaVerne Thompson* as **Exhibit "D"** is the final *Client Claim Status Report* for Linda Scott's medical benefits between the date of divorce, August 22, 2014, through and including May 5, 2017, the date of her death. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 12). The potential for refunds for payments other than medical is not available. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 13). The *Client Claim Status Report* dated October 7, 2019 reflects a total of $148,870.54 paid to medical providers, and the total of $94,414.39 received in refunds from providers, and a balance of $54,456.15 in uncollected medical expense damages. This is the Final Report; thus, these numbers will not change as refunds or reimbursements are no longer possible on any of the *claims* for benefits on behalf of Linda Scott. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 13 **Exhibit "D" - Column D** "Account Status Desc" shows further efforts to collect are no longer possible)[6]. For a complete understanding of

---

[6] Efforts to collect cease depending on various factors, including mail being returned, the provider refused to respond, or the provider agreement does not provide that refunds are possible. In some agreements, refunds maybe available for a limited time after having been paid to the provider. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 13).

the medical benefits paid and the refunds or reimbursements made on behalf of Linda Scott, (See *Supplemental Affidavit of LaVerne Thompson* ¶ 12 and **Exhibit "D"**).

The *Statement of Prescription History* is another business record generated by the Claims Administrator. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 15 (**Exhibit "E"**). Similar to the *Client Claim Status Report*, the Claims Administrator uses this report as a summary of prescription *claims* processed on behalf of Linda Scott. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 15-16). This document shows the total cost for her prescriptions was $116,053.73. (See *Supplemental Affidavit of LaVerne Thompson* (**Exhibit "E"**)). Under the *Plan*, Linda Scott would have been responsible for a co-pay or deductible totaling $1,339.06. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 14 (**Exhibit "A"** (*Plan*) Art. 5 §5.02.01); (**Exhibit "B"** (*SPD*) "*MILA Premier Plan*" p. 6-9) & (**Exhibit "E"**)). The total balance paid by and now owing to MILA for prescription benefits is $114,714.67. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 16 (see **Exhibit "E"**).

The *Statement of Dental Claims* is a business record generated by the Claims Administrator to track and summarize dental benefit *claims* processed on behalf of Linda Scott. (See *Supplemental Affidavit of LaVerne Thompson* ¶¶ 17-19 (**Exhibit "F"**)). The *Statement of Dental Claims* reflects what the Claims Administrator paid. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 19 (**Exhibit "F"**)). The amount still owed to MILA is $2,254.85 for Dental Benefits. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 19 (**Exhibit "F"**).

The Vision Benefits paid on behalf of Linda Scott are shown exclusively through the *Explanation of Benefits* generated by the Claims Administrator to provide the *Plan* Participant/Patient with a summary of the vision benefits. (See *Supplemental Affidavit of LaVerne Thompson* ¶¶ 21-22 (**Exhibit "G"**)). The *Explanation of Benefits* reflects the amount the Claims

Administrator paid for vision benefits on behalf of Linda Scott and that MILA is owed is $180.00.

(See *Supplemental Affidavit of LaVerne Thompson* ¶ 22 (**Exhibit "G"**)).

## SUMMARY

Here, the numbers calculated by Plaintiff are determined by the payments made on behalf

of Linda Scott during the time Linda Scott was ineligible for benefits under the terms of the *Plan*,

less any refunds or reimbursements that MILA was able to obtain for medical services. The

payments induced by fraud and negligent misrepresentation were paid according to the terms of

the *Plan* by the Claims Administrators, who were acting in accordance with the procedures in their

normal course of business and pursuant to the agreements with service providers.

## COBRA

### I.     The Failure to Provide COBRA Coverage

The *Final Judgment and Decree* of divorce required Defendant Gary Scott to provide for

COBRA coverage for so long as Linda Scott was entitled to continuation coverage. (*Final*

*Judgment and Decree*, p. 3 (Doc. 14-1, filed Oct. 8, 2019, p. 10-13 "**Attachment I**" to the *Amended*

*Affidavit of LaVerne Thompson*, which was attached as **Exhibit "1"** to *Plaintiff's Renewed Motion*

*for Default Judgment and Supporting Memorandum*)).   Defendant received the *Summary Plan*

*Description* which describes the rights and obligations for continuation coverage stating that

"[**u**]**nder the law, you or your dependent are responsible for providing notice to MILA of the**

**occurrence of certain *Qualifying Events* under which you or your dependent will lose**

**coverage under the Plan**." (See *Supplemental Affidavit of LaVerne Thompson* ¶ 23 (**Exhibit "B"**

(*SPD*) "*Notice of a   Qualifying Event*" p. 78) (**Exhibit "A"** (*Plan*) Art. 2 §2.08.05.01(b) p. 45))

(emphasis added). The *Summary Plan Description* also informs Participants that divorce is a Qualifying Event under the *Plan*. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 23 (**Exhibit "A"** (*Plan*) Art. 2 §2.08.03(c) p. 43); (**Exhibit "B"** (*SPD*) "*Notice of a Qualifying Event*" p. 78)). The divorce of a Participant/Covered Employee from their Spouse terminates coverage of the Spouse on the day of the divorce. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 23 (**Exhibit "A"** (*Plan*) Art. 1 §1.11.05 p. 7); (**Exhibit "B"** (*SPD*) "*Your Eligible Dependents*" p. 69)). "Any Eligible Employee … must notify MILA upon receipt of any interlocutory or final decree in a proceeding to dissolve or terminate the marriage." (See *Supplemental Affidavit of LaVerne Thompson* ¶ 23 (**Exhibit "A"** (*Plan*) Art. 1 §1.11.05 p. 7); (**Exhibit "B"** (*SPD*) "*Notice of a Qualifying Event*" p. 78)).

## ARGUMENT

The notice requirements for continuation coverage are outlined in Title 29 of the United States Code, §1166(a)(3), which confers upon "**each covered employee or qualified beneficiary**" the duty to notify the Plan Administrator of the occurrence of a divorce or legal separation, as a "qualifying event" covered in 29 USC §1163(3). This statutory prerequisite is what imposes the conditional duty to act upon the Plan Administrator.

Widely cited for the proposition, the Fifth Circuit declined to hold a Plan Administrator responsible for damages, in part because the Administrator never acquired a duty to notify participants of COBRA continuation rights. *Kidder v. H & B Marine, Inc.*, 932 F.2d 347, 356-57 (5th Cir. 1991) ("that duty does not come into play *unless* the administrator is properly notified of

the occurrence of a qualifying event…") (emphasis added)[7]; *See Also Vincent v. Wells Fargo Guard Servs.*, 44 F. Supp. 2d 1302, 1304-05 (S.D. Fla. Mar. 24, 1999) (a COBRA notice obligation was not triggered due to the failure of an employer to provide notice of a Qualifying Event); *Chacosky v. Hay Group*, 1991 U.S. Dist. LEXIS 1170, *26, (E.D. Pa. Jan. 31, 1991) (holding there was no qualifying event, so there was no duty to notify under CORBA). *See generally Williams v. Teamsters Local Union No. 727*, 2003 U.S. Dist. LEXIS 18906, *13, 31 Employee Benefits Cas. (BNA) 1872 (N.D. Ill. Oct. 22, 2003) (discussing the definition of a qualifying event as one in which results in the loss of coverage and triggers a duty).

Interestingly, *Kidder* involved the question of whether the Plan Administrator inherited the duty to make an "initial notice," informing participants of the availability of coverage and outlining their rights under the law. *Kidder*, at 356-57. The Fifth Circuit held that neither the one-time requirement deriving from §1166(a)(1), or the continuing duty to provide notice triggered by qualifying events in §1166(a)(3) were applicable. *Id*. Because while the once-exempted, small business became eligible for continuation coverage; duties to notify never attached because the plan administrator was not told the company met qualifying conditions—or of any qualifying event that would change participant's rights. *Kidder*, at 356.

In *Vincent*, the plaintiff sought relief from the employer for not receiving notice of his right to continuation coverage. *Vincent*, at 1304. The district court there cited §1166(a)(4) for the

---

[7] In *Kidder*, the Plaintiff worked for the company H&B Marine, Inc., which worked closely with H&B Construction of Louisiana and often switched out employees depending on need. *Id*. at 349. The two companies merged during the Plaintiff's term of employment before he was terminated. *Id*. The *Kidder* Court found that a single premium statement with more than 20 employees was not enough to constitute "notice." *Id*. at 349-50. In this case, there was nothing at all to prompt even an inquiry of whether a duty to provide notice had been triggered.

proposition that the duty to notify "was not triggered" because the plan administrator did not receive notice of the qualifying event. *Id.*

Defendant Scott never notified MILA of his divorce; therefore, coverage ceased and was never continued under COBRA provisions. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 25). The right to elect COBRA continuation coverage was lost because notice was not given within the required 60 - days. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 25 (**Exhibit "A"** (*Plan*) Art. 2 §2.08.05.01(b) p. 44-45, §2.08.07 p. 46)). In fact, notice was never given to MILA. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 25). Had coverage been continued under COBRA, Defendant would have been required to self-pay up to 102% of the actuarially-determined cost of coverage for the period of such coverage. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 25 (**Exhibit "A"** (*Plan*) Art. 2 §2.08.08 p.46); (**Exhibit "B"** (*SPD*) "*Paying for COBRA Coverage*" p. 79)). Once the COBRA continuation right ends, it may not be reinstated. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 24 (**Exhibit "A"** (*Plan*) Art. 2 §2.08.08(b)); (**Exhibit "B"** (*SPD*) "*Making a COBRA Election*" & "*Paying for COBRA Coverage*" p. 79)). Defendant did not self-pay as required to provide continuation of coverage; therefore, there is no reduction of damages. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 25 (**Exhibit "A"** (*Plan*) Art. 2 §2.08.08 p. 46); (**Exhibit "B"** (*SPD*) "*Paying for COBRA Coverage*" p. 79)).

The Defendant misrepresented his marital status when he did not notify MILA of his divorce, the COBRA Qualifying Event. He misrepresented and committed fraud upon MILA, thereby causing significant damages.

## II.    The Defendant is not required to Pay for MILA benefits.

As stated above, the MILA National Health Plan Fund is self-insured with contributions coming from employers under the *Master Contract*. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 3 (**Exhibit "A"** (*Plan*) Art. 1 §1.16 p. 8, §1.17 p. 9); (**Exhibit "B"** (*SPD*) "*Overview of MILA National Health Plan*" p. 2)). The Members enjoying benefits for themselves and their Dependents are covered after earning the required number of credited hours working for an employer that contributes to the Fund. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 3 (**Exhibit "A"** (*Plan*) Art. 1 §1.16 p. 8, §1.17 p. 9, Art. 2 §2.01.02(b) p. 22); (**Exhibit "B"** (*SPD*) "*Who is Eligible*" p. 68)). The Defendant worked under the *Collective Bargaining Agreement* (*CBA*) more than the required number of hours to entitle him to coverage under the *MILA Premier Plan*. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 4); (*See Also*, See **Attachment "1"** *Affidavit of Terry Ambrose* ¶ 4 (**Exhibit "I"**)). The *Plan* does not require payment from a covered individual for his coverage or for that of his legal Spouse. (See *Supplemental Affidavit of LaVerne Thompson* ¶ 4 (**Exhibit "A"** (*Plan*) Art. 1 §1.11.05 p. 7); (**Exhibit "B"** (*SPD*) "*Your Eligible Dependents*" p. 69)).

Georgia law provides that even when an insurance policy is obtained by fraud, an insurer would be required to return any premiums paid under the contract when an insurer seeks to rescind. O.C.G.A. § 13-4-60 (LEXIS current through 2019 General Assembly) (previously § 20-906); *PHL Variable Ins. Co. v. Faye Keith Jolly Irrevocable Life Ins. Trust*, 460 Fed. Appx. 899, 902 (11th Cir. 2012); *Weems v. Am. Nat'l Ins. Co*., 29 S.E.2d 500, 502 (Ga. 1944).

As applies to this case, there were no premiums paid to ensure coverage under the *Plan*, for Defendant or his Spouse, and nor was there ever a premium paid towards continuation coverage.

Benny Holland, Jr., David F. Adam, and
Management-ILA Managed Health Care Trust Fund v. Gary Scott
4:19-cv-00022-WTM-CLR
*Plaintiff's Brief in Support of Request for Award of Appropriate Damages*

## CONCLUSION

The district courts of Georgia recognize it unnecessary to hold a hearing on damages when all of the evidence is already in the record and supported by affidavits. *Frazier v. Absolute Collection Serv.*, 767 F. Supp. 2d 1354, 1365 (N.D. Ga. Dec. 28, 2010). Therefore, **in answer to this Court's question as to the Method of Calculating damages,** Plaintiff has submitted the *Supplemental Affidavit of LaVerne Thompson* along with **Exhibits** and explanations of the calculations by which MILA determined its losses. Moreover, because the *Plan* received no payments of any kind from Defendant **before or after his divorce,** there is **no entitlement to a refund. As a result, there is no reduction of damages**.

The Court has recognized the liability of Defendant for fraud and negligent misrepresentation, which induced the payment of benefits on behalf of Linda Scott, while she was ineligible for benefits. Plaintiff, MILA respectfully requests this Court to award **$171,605.67** in damages.

Respectfully submitted this 12th day of December, 2019.

**BIGNAULT & CARTER, LLC**

**BY /S/ W. PASCHAL BIGNAULT**
**W. PASCHAL BIGNAULT, GA. BAR #056862**
**BY /S/ LORI A. CARTER**
**LORI A. CARTER, GA. BAR # 114568**
**BY /S/ CHARLES S. HERMAN**
**CHARLES HERMAN, GA. BAR # 142852**
**ATTORNEYS FOR PLAINTIFFS**

**PARK SOUTH - UNIT F9**
**7505 WATERS AVENUE**
**SAVANNAH, GEORGIA 31406**
**TELEPHONE: (912) 356-0388**
**FACSIMILE : (912) 356-0399**
**E-MAIL: pbignault@bc-laws.com**
**E-MAIL: lcarter@bc-laws.com**
**E-MAIL: cherman@bc-laws.com**